In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 23-1751

YORAM KAHN, individually and
on behalf of all others similarly situated,

*Plaintiff-Appellant,*

*v.*

WALMART INC.,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:22-cv-04177 — **Sara L. Ellis**, *Judge.*

———————————

ARGUED JANUARY 10, 2024 — DECIDED JULY 3, 2024

———————————

Before SYKES, *Chief Judge*, and HAMILTON and LEE, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This appeal turns on what constitutes reasonable consumer behavior for purposes of state consumer protection law. Plaintiff Yoram Kahn alleges that the nation's largest retailer—defendant Walmart Inc.—takes advantage of consumers in Illinois and nationwide with deceptive and unfair pricing practices. At the heart of the case,

Kahn alleges, are numerous small discrepancies between the prices advertised on Walmart's shelves and the prices actually charged at the cash register. The individual discrepancies are small but according to plaintiff add up to hundreds of millions of dollars each year. Kahn alleges that Walmart is aware of these discrepancies between shelf prices and register prices and that its unfair and deceptive pricing practices are pervasive and continuous.

More specifically, Kahn alleges that the discrepancies between shelf prices and register prices violate the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 et seq., the Illinois Uniform Deceptive Trade Practices Act ("UDTPA"), 815 ILCS 510/1 et seq., and other states' consumer protection statutes. Kahn also brings a claim for unjust enrichment. Kahn seeks to sue on behalf of a class of similarly situated consumers.

The district court dismissed the case on the pleadings and denied leave to amend the complaint. We reverse because the complaint states some viable claims. We reject the theory that providing a customer with a receipt after payment stating the actual price charged is sufficient, at least as a matter of law, to dispel any potential deception or unfairness caused by an inaccurate shelf price. We reverse the dismissal of Kahn's ICFA and UDTPA claims for failure to allege a deceptive or unfair practice or the required intent. We agree with defendant that plaintiff has not alleged a plausible likelihood of future injury needed for injunctive relief under the UDTPA, though we modify dismissal of that claim to give plaintiff an opportunity to amend his complaint if he believes he can cure that problem. We reverse the judgment dismissing plaintiff's other

individual and class claims. We remand the case for further proceedings.

I.  *Factual Background & Procedural History*

   A.  *Factual Background*

Defendant Walmart moved to dismiss this case on the pleadings, so we focus on the facts alleged in plaintiff's complaint. Walmart's tactical choice requires us to treat Kahn's factual allegations as true. E.g., *Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

Walmart uses shelf pricing to advertise merchandise prices, to let consumers compare prices, and to induce them to buy the advertised merchandise. Walmart's shelf pricing does not always reflect the price it charges consumers at the point of sale, causing consumers to pay higher prices at checkout. State agencies have imposed fines on Walmart for this practice. For example, in 2012, California assessed a $2 million fine against Walmart for violating a 2008 ruling requiring it to resolve pricing errors at checkout. In November 2021, North Carolina fined two Walmart stores after an investigation found repeated and excessive scanning errors that caused overcharges on three to seven percent of items purchased each month. In February 2022, five additional Walmart stores had to pay North Carolina over $15,000 in fines for overcharging consumers due to price scanning errors.

Plaintiff Kahn is a citizen of Ohio. He shopped at a Walmart store in Niles, Illinois, on August 2, 2022. Kahn alleges that he read and relied on the shelf pricing in deciding what to purchase. Ultimately, he bought fifteen items for a pretax total of $27.69. After paying, Kahn reviewed his receipt. He determined that Walmart charged him more than

the listed shelf price on six of the items he purchased. The advertised shelf prices of these six items ranged from $1.64 for a candy bar to $3.94 for muffins. When Kahn checked out, the actual prices of these six items scanned at ten to fifteen percent markups above the shelf prices. In total, Kahn paid Walmart $1.89 in overcharges on these six items, nearly seven percent of the pretax total of his bill. Small change for Kahn as an individual, no doubt, but keep in mind the volume of Walmart's business.

Kahn's counsel investigated Walmart's shelf pricing at other stores in Illinois and in Florida, Indiana, Maryland, New Jersey, and New York. They found similar examples of overcharges. Counsel also found that, despite being fined by state regulators in February 2022 for overcharges, two Walmart stores in North Carolina continued to have overcharges in August 2022.

B.  *Procedural History*

After his visit to the Walmart in Niles, Kahn filed this lawsuit in federal court alleging that Walmart's pricing discrepancies violate the ICFA, 815 ILCS 505/1 et seq., the Illinois UDTPA, 815 ILCS 510/1 et seq., and equivalent consumer protection statutes in other states. Kahn also brought a claim for unjust enrichment. The number of potential class members and the financial stakes are sufficient to support federal jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), with minimal diversity of citizenship. Walmart moved to dismiss the entire case for failure to state a claim.

The district court granted Walmart's motion to dismiss, finding that plaintiff had failed to allege a plausible claim under the ICFA or the UDTPA, and accordingly, that his unjust

enrichment and class claims also failed. *Kahn v. Walmart, Inc.*, No. 1:22-cv-04177, 2023 WL 2599858, at *1 (N.D. Ill. Mar. 21, 2023). The district court noted that plaintiff tried to allege both unfair and deceptive practices under the ICFA. In federal court, unfair practice claims are usually subject to only the standard pleading requirements of Federal Rule of Civil Procedure 8. But the district court found that all of plaintiff's ICFA allegations were premised on "Walmart's alleged concealment of the actual prices of its items," even though unfairness and deception are distinct theories under the ICFA. *Id.* at *2. The court treated plaintiff's allegations "solely as a deceptive practices claim" and applied Rule 9(b)'s heightened pleading requirements. *Id.*, citing Fed. R. Civ. P. 9(b).

The district court granted the motion to dismiss, reasoning that "where Walmart provides its customers with a receipt to compare the scanned price with the shelf price," there is "no possibility for deception." *Id*. at *3, quoting *Killeen v. McDonald's Corp.*, 317 F. Supp. 3d 1012, 1013 (N.D. Ill. 2018). Here, "Kahn could, and indeed did, use this receipt to compare the prices Walmart charged him with the advertised shelf pricing. This comparison revealed the discrepancy and dispelled any potential deception." *Id*. The district court also held that plaintiff failed to allege that Walmart intended for him to rely on the inaccurate shelf pricing. The court held that providing plaintiff a receipt so he could "compare the shelf price to the scanned price" rendered it implausible that Walmart intended for customers to rely on incorrect shelf prices. *Id.* at *4.

The district court then considered Kahn's remaining claims, finding that they failed "for the same reasons as his ICFA claim." *Id.* His UDTPA claim required the same two

elements he failed to plead adequately under the ICFA, "a deceptive representation, made with the intention that the consumer rely on the misrepresentation." *Id.*, citing 815 ILCS 510/2. The court dismissed the claim for unjust enrichment because it could not stand on its own without a viable statutory claim. Because all of Kahn's individual claims had been dismissed, the district court also dismissed his class claims. Finally, the district court denied plaintiff leave to amend his individual claims on the ground that any amendment would be futile. *Id.* at *5. Plaintiff has appealed.

II. *Analysis*

   A. *Legal Standard*

We review de novo a district court's dismissal of a case under Rule 12(b)(6) for failure to state a claim. E.g., *Proft v. Raoul*, 944 F.3d 686, 690 (7th Cir. 2019). We treat the complaint's factual allegations as true and draw every factual inference in the plaintiff's favor. *Boogaard v. Nat'l Hockey League*, 891 F.3d 289, 290–91 (7th Cir. 2018). A complaint needs to present only "a short and plain statement" of the basis for a claim. Fed. R. Civ. P. 8(a)(2). To avoid dismissal, the factual allegations in the complaint need not prove the claim. They need to show only that the claim is "plausible on its face" and that, if the allegations are true, the plaintiff is entitled to relief. *Roldan v. Stroud*, 52 F.4th 335, 339 (7th Cir. 2022), citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

This pleading standard requires plaintiffs to allege only enough facts to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. To be plausible rather than merely conceivable means that the complaint's "factual content … allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Firestone Financial Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015), quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The factual allegations must present "more than a sheer possibility" that the defendant's conduct is unlawful, *Iqbal*, 556 U.S. at 678, but a complaint survives a motion to dismiss "even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013), quoting *Twombly*, 550 U.S. at 556.

We agree with the district court that some of Kahn's claims sound in fraud and are thus subject to a higher pleading standard under Rule 9(b). See *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (Rule 9(b) applies to any claim that "sounds in fraud"); *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014) (applying Rule 9(b) pleading standard to ICFA claim). Rule 9(b) requires a pleading to "state with particularity the circumstances constituting fraud." It is designed "to force the plaintiff to do more than the usual investigation before filing his complaint." *Ackerman v. Northwestern Mutual Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). The precise level of particularity required under Rule 9(b) depends on the facts of the case, but the rule "ordinarily requires describing the who, what, when, where, and how of the fraud." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (internal quotations omitted). Still, even Rule 9(b) allows malice, intent, knowledge, and other conditions of a person's mind to be alleged "generally."

We focus in Part B on the reasonable consumer standard as it applies to this case. We explain then in Part C how Kahn has alleged viable claims for deceptive and unfair practices

under the ICFA, addressing Walmart's counterarguments as we go. We explain in Part D why we reverse the district court's dismissal with prejudice of Kahn's other individual claims under the UDTPA and for unjust enrichment, as well as its dismissal without prejudice of his class claims.

B.  *Reasonable Consumer Behavior*

The state consumer protection laws at issue here all require plaintiffs to prove that the relevant acts or practices are "likely to deceive reasonable consumers." *Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 474 (7th Cir. 2020), quoting *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). This standard "requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Id.*, quoting *Beardsall*, 953 F.3d at 973; see also *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1017 (9th Cir. 2020) (adopting same "reasonable consumer" test for California consumer protection statute). The qualifier "in the circumstances" is significant. Courts considering whether consumers are "acting reasonably" must "take into account all the information available to consumers and the context in which that information is provided and used." *Bell*, 982 F.3d at 475, 477.

Reasonable consumer behavior is not a matter of pure economic theory. Rather, reasonable consumer behaviors are "matters of fact, subject to proof that can be tested at trial, even if as judges we might be tempted to debate and speculate further about them." *Id.* at 481. In establishing reasonable consumer behavior, what matters is "how consumers actually behave—how they perceive advertising and how they make decisions." *Id.*

In applying consumer protection laws, we do not typically hold consumers to the standard of Adam Smith's *homo economicus*, a perfectly rational being who gathers and evaluates the optimal amount of information about options in the marketplace to maximize utility preferences. See *Honorable v. Easy Life Real Estate System*, 100 F. Supp. 2d 885, 888 (N.D. Ill. 2000) ("[T]he economic theories that imply that market prices are efficient, thus beneficial for consumers, presuppose that consumers are informed, markets are competitive, and the costs of making transactions are not excessively burdensome. … [N]eoclassical economics in fact assumes *perfect* information."). It is well known that human cognitive abilities are not perfect or infinite. We have limited time, computational skills, and memories, and we rationally use mental shortcuts to deal with those limits.[1] The classical economic model often fails to predict accurately how real humans will behave in real-life marketplaces. See *Carmody v. Board of Trustees of University of Illinois*, 747 F.3d 470, 475 (7th Cir. 2014) (noting "decades of behavioral research" demonstrating predictable cognitive biases, citing Daniel Kahneman, Thinking Fast and Slow (2011)).

Predictable tendencies in consumer behavior mean that retail settings can be engineered to influence consumers in ways they (meaning we) do not fully anticipate or appreciate. "'[M]arket outcomes frequently will be heavily influenced, if not determined, by the ability of one actor to control the format of information, the presentation of choices, and, in general, the setting within which market transactions occur,'

---

[1] See generally, e.g., Christine Jolls, Cass R. Sunstein & Richard H. Thaler, *A Behavioral Approach to Law and Economics*, 50 Stan. L. Rev. 1471, 1476–77 (1998).

allowing some to 'exploit those tendencies for gain.'" *Honorable*, 100 F. Supp. 2d at 888, quoting Jon D. Hanson & Douglas A. Kysar, *Taking Behavioralism Seriously: The Problem of Market Manipulation*, 74 N.Y.U. L. Rev. 630, 635 (1999). The market itself usually cannot correct for these problems. Instead, consumer protection regulations are often responses to inefficiencies enabled by market manipulation.[2]

"We doubt it would surprise retailers and marketers if evidence showed that many grocery shoppers make quick decisions that do not involve careful consideration of all information available to them." *Bell*, 982 F.3d at 481.[3] "Lots of

---

[2] "Market competitors will, to survive in the long run, 'discover' precisely which situational manipulations most efficiently influence us and how. Market actors who fail to manipulate situational variables effectively will sooner or later be supplanted by those who do." Jon Hanson & David Yosifon, *The Situation: An Introduction to the Situational Character, Critical Realism, Power Economics, and Deep Capture*, 152 U. Pa. L. Rev. 129, 198 (2003).

[3] A great deal of market research is likely to be available to plaintiff Kahn to support his allegations and inferences, and to Walmart in defending its practices. "A market capable of producing the modern supermarket is a market capable of untold manipulation." Jon D. Hanson & Douglas A. Kysar, *Taking Behavioralism Seriously: Some Evidence of Market Manipulation*, 112 Harv. L. Rev. 1420, 1444 (1999). Twenty-five years ago, Hanson and Kysar wrote:

> In large part because the market for groceries in the United States is so sizable and competitive, marketing researchers have devoted more attention to the supermarket than to any other retail environment. The cumulative result of their efforts is a marketing marvel, a shopping climate scientifically calibrated to induce as many unplanned purchases as can possibly be wrought from the 'sovereign' consumer.

advertising is aimed at creating positive impressions in buyers' minds … subtly by implication and indirection." *Id.* at 477. Only by interpreting the reasonable consumer standard

---

*Id.* at 1444. Retailers know "that blue color schemes impart calm sensations and that shoppers walk more slowly and spend more time when the music is slow in tempo." *Id.* at 1445 (internal quotations omitted). They know "that piped aromas (fake, of course) can increase bakery sales[,] … that deli selections can be used to create the illusion of choice and that spraying water on waxed produce can cause visceral improvements in customer perception." *Id.* Store, aisle, and shelf layouts are designed with scientific exactitude to maximize sales. "Because the best viewing angle is 15 degrees below the horizontal, the choicest elevation on any aisle has been measured at 51 to 53 inches off the floor." *Id.* at 1448 (cleaned up). "[S]taples such as milk, bread, and eggs are placed at opposite extremes of the supermarket to force shoppers to cover as much store real estate as possible." *Id.* at 1447. "[S]tocking soup cans out of alphabetical order can greatly increase sales by forcing customers to search through a variety of cans." *Id.* at 1449. And "the way a price label is designed, such as whether a dollar sign is included, can influence how consumers view the actual price." Rory Van Loo, *Helping Buyers Beware: The Need for Supervision of Big Retail*, 163 U. Pa. L. Rev. 1311, 1333 (2015).

"The aim of atmospherics, like all supermarket sleights-of-hand, is to maximize unplanned purchases." Hanson & Kysar, *Some Evidence of Market Manipulation*, 112 Harv. L. Rev. at 1446. "[T]he average time to make buying decisions in a supermarket is a matter of seconds," and "two out of every three supermarket purchases are not planned." *Id.* "One study determined that forty percent of supermarket shoppers did not check the price of goods they chose, and less than half could identify the price of goods that they had just put in their shopping cart." *Id.* at 1450. Advances in gathering and analyzing data have enabled further engineering of supermarkets and other retail settings. See Van Loo, *Helping Buyers Beware*, 163 U. Pa. L. Rev. at 1322 ("Mass retailers continually fine-tune their pricing algorithms through advanced behavioral data-mining operations" and "film customers' in-store movements, compile loyalty card data, and conduct many randomized controlled trials that easily provide statistical significance across thousands of stores and millions of transactions.").

in line with actual consumer behavior can consumer protection laws help address problems posed by unfair or deceptive market manipulation. *Id.* ("[T]he reasonable consumer standard" must "stay[] in touch with real consumer behavior."). Our focus in applying the reasonable consumer standard must include "how real consumers understand the carefully crafted messages aimed at them." *Id.* at 480.

In considering inferences that can, and at this stage must, be drawn in Kahn's favor, we reject Walmart's arguments that courts should overlook the realities of attempts to influence consumer behavior. This case concerns the nation's largest retailer, which allegedly stands to profit by hundreds of millions each year from shelf pricing discrepancies. It is reasonable to assume that Walmart can afford to and does hire leading consumer researchers and experts.[4]

If Walmart invests in designing its stores to influence the behavior of real consumers, it cannot defeat claims of unfair and deceptive business practices with arguments that assume consumer behavior in idealized markets with "*perfect* information, *perfect* competition, and *no* transactions costs." *Honorable*, 100 F. Supp. 2d at 888. "[W]e have often stressed that consumers are likely to exhibit a low degree of care when purchasing low-priced, everyday items." *Bell*, 982 F.3d at 479. This low degree of care does not make consumers unreasonable—it makes them human, and even economically

---

[4] To maintain its profit margins in highly competitive retail markets, Walmart competes in an "arms race" with other large retailers like Amazon "to hire mathematicians and statisticians to analyze the results of in-store experiments and to develop behavioral modeling algorithms from their troves of data." Van Loo, *Helping Buyers Beware*, 163 U. Pa. L. Rev. at 1331.

rational when search costs and transaction costs are included in the utility calculus. But it also makes them vulnerable to exploitation by unfair and deceptive practices. When determining reasonable consumer behavior for purposes of consumer protection law, we should consider the behavior of real consumers instead of Adam Smith's *homo economicus* with perfect information.[5]

### C. *Plausibly Alleging a Claim Under the ICFA*

Against this background, we apply the reasonable consumer standard to assess the plausibility of plaintiff's allegations. He seeks relief under the ICFA, which is "a regulatory and remedial statute intended to protect consumers … against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019), quoting *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 416–17, 775 N.E.2d 951, 960 (2002). The ICFA prohibits the following:

---

[5] Accord, *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1018 (9th Cir. 2020) (consumers can be made "susceptible to purchasing because they won't have the time or interest to read about the product on the website or the back of the box" (cleaned up)); *Moore v. Trader Joe's Co.*, 4 F.4th 874, 883 (9th Cir. 2021) ("reasonable consumer might not be an expert" in food production processes); *Mantikas v. Kellogg Co.*, 910 F.3d 633, 637 (2d Cir. 2018) (reasonable consumers not expected "to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box" (quoting *Williams v. Gerber Products Co.*, 552 F.3d 934, 939 (9th Cir. 2008)); *Dumont v. Reily Foods Co.*, 934 F.3d 35, 40–41 (1st Cir. 2019) ("reasonably acting, hazelnut-loving consumers" could rely on product name, "Hazelnut Crème coffee" to conclude that it contained hazelnut, with "no need to search the fine print on the back of the package").

> unfair or deceptive acts or practices, including
> but not limited to the use or employment of any
> deception[,] fraud, false pretense, false promise,
> misrepresentation or the concealment, suppres-
> sion or omission of any material fact, with intent
> that others rely upon the concealment, suppres-
> sion or omission of such material fact, or the use
> or employment of any practice described in Sec-
> tion 2 of the [UDTPA].

815 ILCS 505/2. The UDTPA in turn declares the following
business practices to be deceptive, among others: "adver-
tis[ing] goods or services with intent not to sell them as ad-
vertised; … mak[ing] false or misleading statements of fact
concerning the reasons for, existence of, or amounts of price
reductions; [or] … engag[ing] in any other conduct which
similarly creates a likelihood of confusion or misunderstand-
ing." 815 ILCS 510/2(a)(9), (11), & (12).

To plead a deceptive practices claim under the ICFA, a pri-
vate plaintiff must allege: (1) that the defendant engaged in a
deceptive or unfair practice; (2) with the intent that the plain-
tiff (or others) rely on the deception; (3) that the act occurred
in the course of trade or commerce; and (4) that the deception
caused actual damages. *Robinson*, 201 Ill. 2d at 417; see also
*Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 739 (7th Cir.
2019) (applying Rule 9(b) to ICFA deceptive practices claim);
*Benson*, 944 F.3d at 646 (same).

In the district court and on appeal, Walmart challenged the
first two elements at the pleadings stage. We first explain why
plaintiff has plausibly alleged a deceptive practice under the
ICFA with the particularity required by Rule 9(b) and an un-
fair practice under Rule 8(a). We then explain why plaintiff

has plausibly alleged that Walmart intended for him and other customers to rely on its misleading shelf prices.

1. *Deceptive Act or Practice*

Courts apply a "reasonable consumer" standard in evaluating the likelihood of deception and look at this question in view of the "totality of the information" available to the consumer at the point of deception. *Benson*, 944 F.3d at 646; accord, *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 884 (7th Cir. 2005). Where, as here, the alleged deceptive practice involves misleading labels, the ICFA requires plaintiff to allege plausibly "'that the relevant labels are likely to deceive reasonable consumers,' which 'requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled.'" *Bell*, 982 F.3d at 474–75, quoting *Beardsall*, 953 F.3d at 972–73.

Plaintiff plausibly alleges that Walmart's inaccurate shelf pricing is a deceptive act or practice within the meaning of the ICFA. There is nothing implausible about his allegations that Walmart's inaccurate shelf prices are likely to deceive a significant portion of reasonable consumers. It is neither "unreasonable" nor "fanciful" for consumers to believe Walmart will sell them its merchandise at the prices advertised on its shelves. See *Bell*, 982 F.3d at 477. Illinois consumer protection law assumes that consumers will rely on advertised prices. Both the ICFA and the UDTPA declare "misleading statements of fact concerning the … existence of … price reductions" to be deceptive acts. 815 ILCS 510/2(a)(11). Here, the advertised shelf prices are not alleged to have been accompanied by any statements warning they might not be reliable or

saying they were provisional. If shelf prices are not accurate, they are likely to mislead reasonable consumers.[6]

The remainder of this subsection proceeds in two parts. First, we explain why the district court erred in concluding that providing a receipt after the transaction dispels as a matter of law any deception created by Walmart's facially misleading shelf prices. Second, we explain how plaintiff alleges what amounts to a form of "bait-and-switch" deception, a theory that survives dismissal on the pleadings even when a consumer discovers the price discrepancy before completing a transaction, let alone after.

The district court agreed that reasonable consumers would be misled by Walmart's inaccurate shelf prices but held that once those consumers were given receipts with the actual prices charged, no reasonable consumer would remain deceived. *Kahn*, 2023 WL 2599858, at *3 ("[W]here Walmart provides its customers with a receipt to compare the scanned price with the shelf price," it leaves "no possibility for deception." (quoting *Killeen*, 317 F. Supp. 3d at 1013)). Here, "Kahn could, and indeed did, use this receipt to compare the prices Walmart charged him with the advertised shelf pricing. This comparison revealed the discrepancy and dispelled any potential deception." *Id.*

We understand the court's point but respectfully disagree with the conclusion, especially when we focus on reasonable

---

[6] To be actionable under the ICFA, the misrepresentations must also be material to reasonable consumers. *Smith v. Prime Cable of Chicago*, 276 Ill. App. 3d 843, 857, 658 N.E.2d 1325, 1336 (1995). Price is obviously a material term of consumer transactions. On appeal, Walmart wisely does not challenge the materiality of its alleged misrepresentations regarding price.

consumer behavior under the totality of the circumstances. For two reasons, merely providing a receipt is insufficient to dispel the deception created by Walmart's inaccurate shelf prices, at least as a matter of law on the pleadings. First, Walmart provides receipts to its customers only after their transactions have concluded. Corrective information provided to the consumer after the transaction will not necessarily affect the reasonable consumer analysis. "A sales receipt provided to a consumer after a purchase cannot show what was supposedly advertised," here, the shelf price. See *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737–38 (7th Cir. 2014). Rather, to be relevant for our analysis, any correction "must have been made to [the consumer] *before* the purchase of the merchandise." *Id.* at 738 (emphasis in original); accord, *Benson*, 944 F.3d at 646–47 (reversing dismissal on pleadings; receipt listing net weight of candy did not necessarily dispel alleged deception created by oversized packaging); *Gansberg v. Kroger*, No. 2022-CH-08071, slip op. at 2–3 (Ill. Cir. Ct., Cook Cnty. Apr. 7, 2023) (denying motion to dismiss; receipt provided by grocery store did not dispel deception created by inaccurate shelf pricing). Because Walmart does not provide a receipt to its customers until after they pay and close the transaction, the receipt does not necessarily dispel the deception created by inaccurate shelf pricing.

Second, Walmart's and the district court's reasoning would require unreasonable efforts by consumers to protect themselves from the deception. As the district court acknowledged, a receipt by itself will not dispel deception created by inaccurate shelf prices. Rather, only plaintiff's comparison of the prices actually charged at the register against the advertised shelf pricing dispelled the potential deception. *Kahn*, 2023 WL 2599858, at *3. Under Walmart's approach to these

pricing inaccuracies, consumers must keep track of the advertised shelf prices for all the items they intend to purchase, either by memory or by documenting shelf prices while shopping. Next, after paying and obtaining a receipt, consumers would need to compare the scanned prices with the shelf prices for all the items. Only then would the "comparison reveal[ ] the discrepancy and dispel[ ] any potential deception." *Id.*

Who does that? For obvious reasons, many reasonable consumers will not undertake such audits. Some consumers lack smartphones to photograph the shelf prices as they shop, requiring them to write down or remember dozens of distinct shelf prices. Others lack the time to retrace their steps through the store, comparing their receipts against all the shelf prices. Even if shoppers somehow retain records of each shelf price, at checkout, many are trying to corral young children, others are skimming the tabloid headlines displayed to entice them, and still others are lending a hand to the baggers or pulling out their wallets. Shoppers can easily miss the split-second display of a price or two at checkout. Even if consumers do notice a price discrepancy on a point-of-sale display or on a receipt, they must then raise the issue to the store's attention to resolve it. It is reasonable to infer that many consumers in that situation would be concerned about holding up the six shoppers in line behind them, reluctant to trouble a busy store manager over a few pennies per item, or unable to spare the time to track that manager down.

Reasonable consumer behavior does not require shoppers to audit their transactions and to overcome those additional hurdles just to ensure that they receive merchandise at the advertised shelf prices. "What matters most is how real

consumers understand and react to the advertising." *Bell*, 982 F.3d at 476. These consumer protection laws do not expect or require real consumers to undertake such measures over a few pennies per item. Nor, as plaintiff plausibly alleges, does Walmart expect them to. That is precisely why these alleged price discrepancies may be highly profitable on a large scale and over the long run. "Consumer-protection laws do not impose on average consumers an obligation to question the labels they see and to parse them as a lawyer might for ambiguities" or inaccuracies, "especially in the seconds usually spent picking a low-cost product." *Id.* at 476.

Walmart's defense theory tries to impose "a one-size-fits-all use of economic theory" in circumstances "where the applicability of [that theory's] fundamental assumptions to the facts at hand" is put in question by plaintiff's allegations about how real consumers react to Walmart's shelf pricing. See *Honorable*, 100 F. Supp. 2d at 892. In the circumstances alleged here, consumers' failure to audit their transactions and to seek refunds does not, at least as a matter of law, excuse Walmart from honoring its advertised shelf prices. See *Kroger*, No. 2022-CH-08071, slip op. at 3 (Ill. Cir. Ct., Cook Cnty. Apr. 7, 2023) (denying motion to dismiss and rejecting as defense to deceptive practices claim retailer's argument that consumers must audit transactions to ensure that shelf prices are honored). These questions cannot be resolved as a matter of law based on only attorney arguments that reasonable consumers should audit their receipts. "An undefended assumption, even if it is part of an economic theory," cannot prevail on a motion to dismiss. *Honorable*, 100 F. Supp. 2d. at 889. Instead, plaintiffs "are entitled to present evidence on how consumers actually understand these labels" and respond to Walmart's advertising. *Bell*, 982 F.3d at 480. Plaintiff has alleged

plausibly that many reasonable consumers will remain unaware of price discrepancies even after a receipt is provided. The district court erred in finding on the pleadings that providing a receipt dispelled any possibility for deception.[7]

Plaintiff has also adequately pled that Walmart's price discrepancies constitute a deceptive act or practice even where the consumer discovers the price discrepancy *before* completing a transaction. Plaintiff alleges that Walmart's inaccurate shelf prices constitute a form of "bait-and-switch" pricing scheme in which a retailer "advertised goods with an intent not to sell them as advertised." *Chandler v. American General Finance, Inc.*, 329 Ill. App. 3d 729, 739–40, 768 N.E.2d 60, 69 (2002). Both courts applying Illinois law and federal regulators have recognized "bait-and-switch" pricing as a deceptive practice. *Id.*; see also Trade Regulation Rule on Unfair or Deceptive Fees, 88 Fed. Reg. 77420, 77432 (proposed Nov. 9, 2023) (to be codified at 16 C.F.R. § 464) ("Pricing structures that do not initially disclose the total cost of a good or service are deceptive even if the total cost is disclosed at some point during the transaction. It has long been the FTC's position that misleading door openers are deceptive.").[8]

---

[7] We emphasize that we are reviewing only the complaint. Nothing we say here would prevent Walmart from trying to prove that providing a receipt or a point-of-sale price display does, as a factual matter, dispel any deception created by inaccurate shelf prices. See *Bell*, 982 F.3d at 478 (reversing dismissal on pleadings: "nothing we say in this opinion is intended to foreclose defendants from offering evidence to show that consumers are not actually misled by their … labels").

[8] These deceptive pricing structures, also known as "drip pricing," are the subject of a current rulemaking by the FTC. Trade Regulation Rule on Unfair or Deceptive Fees, 88 Fed. Reg. 77420 (proposed Nov. 9, 2023) (to be codified at 16 C.F.R. § 464); see also *Hettinger v. Bozzuto Management Co.*,

Plaintiff alleges that Walmart's shelf prices do not disclose the total price for goods or services, but instead advertise a lower cost to consumers that is ultimately inflated by mandatory charges at the register. Bait-and-switch pricing schemes like the one alleged here lead to injuries that consumers "cannot reasonably avoid," which come "in the form of higher prices and search costs." *Id.* at 77433. In a "bait-and-switch" pricing scheme, "either the consumer must spend additional time searching for full pricing information to engage in comparison shopping, or must make an uninformed decision." *Id.* at 77433–34 (internal citation omitted). "[C]onsumers may find it too costly to search for total price information for some or all goods under consideration" for any of a variety of the real-life reasons noted above. *Id.* at 77445. "This leads consumer demand to become less elastic, and consumers will accept higher prices relative to an efficient equilibrium." *Id.* Because of the unavoidable harms to consumers, "when the initial contact with a consumer shows a lower or partial price without disclosing the total cost," it remains deceptive "even if the total cost is later disclosed." *Id.* at 77432. In this case, plaintiff has adequately pled that Walmart's price discrepancies may operate as a deceptive "bait-and-switch" scheme even where the consumer discovers the price discrepancy before completing a transaction. Whether he can prove that effect is a question for a later stage of the case.

---

2024 WL 1833855, at *3–5 (D.D.C. April 26, 2024) (Boasberg, C.J.) (collecting cases and holding plaintiff plausibly alleged that drip-pricing scheme would mislead reasonable consumers), citing David Adam Friedman, *Regulating Drip Pricing*, 31 Stan. L. & Pol'y Rev. 51, 53–54 (2020).

2. *Unfair Act or Practice*

For many of the same reasons, Kahn has adequately alleged that Walmart's inaccurate shelf pricing also constitutes an "unfair" practice under the ICFA. The district court started on the wrong foot by assessing Kahn's unfairness claims under Rule 9(b) instead of Rule 8(a). A deceptive practices claim under the ICFA must meet Rule 9(b)'s heightened pleading standard, but an unfair practices claim need not if it is not based on fraud. *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014). The applicable pleading standard does not turn on a formalistic invocation of the word "unfair." *Id.* It depends instead on the plaintiff's factual allegations. See *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). If a claim "sounds in fraud—in other words, … is premised upon a course of fraudulent conduct"—then Rule 9(b) applies. *Id.* (internal quotation marks omitted).

The district court reasoned that all of plaintiff's claims sound in fraud since they are premised on "Walmart's alleged concealment of the actual prices of its items." *Kahn*, 2023 WL 2599858, at *2, citing *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018). But *Haywood* involved common underlying factual allegations that the defendant "intentionally misled consumers by hiding information." 887 F.3d at 333. In other words, the *Haywood* plaintiff premised all of her claims on the defendant's alleged intent to deceive, meaning that all of her claims sounded in fraud.

Here, separate from his allegations of deceptive practices, Kahn alleges that Walmart's pricing practices "offend an established public policy, and are immoral, unethical, oppressive, and unscrupulous," in ways that have been "substantially injurious to consumers." Kahn's unfairness claim is not

necessarily premised on intentional deception, as were the claims in *Haywood*. Even if all potential for deception were deemed to have been dispelled by a receipt (a proposition we reject), Walmart's inaccurate shelf prices could still constitute an "unfair" business practice by creating a situation that is "oppressive" and substantially injures consumers. *Batson v. Live Nation Entertainment, Inc.*, 746 F.3d 827, 830 (7th Cir. 2014) (Illinois recognizes federal *Sperry* test for determining whether conduct is unfair under ICFA), citing *Federal Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972). The district court should have assessed this separate unfairness claim under the less demanding standard of Rule 8(a).

Under the proper standard, Kahn adequately alleged that Walmart's inaccurate shelf prices constitute an "unfair" practice within the meaning of the ICFA. To determine whether a practice is unfair within the meaning of the ICFA, courts look to three factors: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and/or] (3) whether it causes substantial injury to consumers." *Benson*, 944 F.3d at 647, quoting *Robinson*, 201 Ill. 2d at 417–18. "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Robinson*, 201 Ill.2d at 418, quoting *Cheshire Mortgage Service, Inc. v. Montes*, 223 Conn. 80, 106, 612 A.2d 1130, 1143–44 (1992).

As for public policy, both the ICFA and the UDTPA expressly prohibit "misleading statements of fact concerning the … existence of … price reductions." 815 ILCS 510/2(a)(11). In the context of bait-and-switch schemes under the ICFA, this court has noted that "[w]hat is deceptive is also unfair."

*Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 464 (7th Cir. 2014).

On the second factor, "[w]hether a practice is immoral, unethical, oppressive, or unscrupulous depends on whether it has left the consumer with little choice but to submit to it." *Newman v. Metropolitan Life Ins. Co.*, 885 F.3d 992, 1002–03 (7th Cir. 2018). We have recognized that under certain circumstances, the existence of sunk costs may create a situation in which consumers are oppressed. See *id.* at 1003 (increase in insurance premiums left consumer little choice but to submit when alternative was forfeiting eight years of sunk costs). Here, for the reasons already explained, even consumers who spot a price discrepancy at checkout are left with little choice but to submit. The alternative is to spend more time and effort in comparison shopping and rectifying any overcharges.

On the third factor, explaining how Illinois courts would determine whether substantial injury existed, this court has said that "the injury must: (1) be substantial; (2) not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) be an injury that consumers themselves could not reasonably have avoided." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010). Small injuries to many consumers may be substantial for these purposes. See *People ex rel. Hartigan v. Stianos*, 131 Ill. App. 3d 575, 581, 475 N.E.2d 1024, 1029 (1985) ("While the three sales upon which this case is premised reflect only a few cents in overcharges, it is apparent that similar overcharges, if permitted to continue, could aggregate very substantial losses and injury to the consuming public.").

The FTC agrees: "Charging consumers under [these] false pretenses causes substantial injury, including where the

injury is a small harm to a large number of people." Trade Regulation Rule on Unfair or Deceptive Fees, 88 Fed. Reg. at 77435. See also *Saccameno v. Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 632 (N.D. Ill. 2019) (whether defendant's "conduct carries the *potential* to harm a large number of other consumers" is factor in unfairness inquiry (emphasis in original)), remanded in part on other grounds, *Saccameno v. U.S. Bank N.A.*, 943 F.3d 1071 (7th Cir. 2019). On the second prong, the FTC reasons that the substantial injury to consumers "is not outweighed by benefits to consumers or competition" because "[t]he practice of advertising prices that are not the full price does not benefit consumers or competition." Trade Regulation Rule on Unfair or Deceptive Fees, 88 Fed. Reg. at 77434. And on the third, we have already explained why the resulting overcharges are not necessarily avoidable by reasonable consumers.

Kahn plausibly alleges that Walmart's inaccurate shelf prices create an oppressive situation in which a reasonable consumer is often forced by the circumstances and design of Walmart's large retail stores to submit to unexpectedly higher prices charged at the register. On these allegations, Walmart's pricing practices carry the potential to cause substantial injury to consumers by causing small harms to large numbers of them. Kahn alleges that Walmart profits on the order of hundreds of millions of dollars from the aggregation of these small overcharges. We have no trouble seeing how Kahn plausibly alleges facts showing that Walmart's inaccurate shelf prices and the resulting overcharges constitute an unfair practice under the ICFA, satisfying the usual pleading standards of Rule 8(a).

### 3. *Intent to Rely*

The district court held that plaintiff failed to allege sufficiently that Walmart intended for him to rely on its inaccurate shelf prices. *Kahn*, 2023 WL 2599858, at *4. Again, we respectfully disagree. First, the ICFA "eliminated the requirement of scienter," so that "innocent misrepresentations are actionable as statutory fraud." *Duran v. Leslie Oldsmobile, Inc.*, 229 Ill. App. 3d 1032, 1039, 594 N.E.2d 1355, 1361 (1992); accord, *Capiccioni v. Brennan Naperville, Inc.*, 339 Ill. App. 3d 927, 933, 791 N.E.2d 553, 558 (2003). To survive a motion to dismiss, plaintiff needed to allege only that Walmart intended that he rely on its shelf prices, not that it intended to deceive him. In this case, he does both, alleging sufficiently that (1) Walmart intended for him to rely on its inaccurate shelf pricing, and (2) that Walmart's shelf pricing is intentionally deceptive.

Even under the heightened standards of Rule 9(b), the rule provides that "intent, knowledge, and other conditions of a person's mind may be alleged generally." Plaintiff alleges that "Walmart uses Shelf Pricing to advertise prices for merchandise … to induce consumers to purchase the advertised merchandise." Plaintiff alleges that "Walmart is well aware that it is deceiving its consumers," in part because Walmart stores have been fined for this practice in multiple states. Plaintiff also alleges that Walmart "knew and calculated that its practices would mislead consumers, continuing such practices despite knowledge of the deception and the harm it caused and causes." He alleges further that Walmart's "unfair and deceptive pricing practices are company-wide, pervasive, and continuous," and that Walmart "continues to allow its stores across the United States" to overcharge customers and "elects not to implement institutional systemic controls to prevent

such practices even after being fined for such practices by lo-cal agencies."

There is nothing implausible about these allegations that Walmart intends consumers to rely on shelf pricing. The con-trary proposition seems absurd. Walmart uses shelf pricing to inform consumers of its prices so they can compare items and decide what to buy. On the record here, there is no indication that Walmart alerts consumers with any clear and prominent disclaimers about inaccurate shelf prices, either on the shop-ping floor or at checkout. Even if Walmart did provide dis-claimers regarding its shelf pricing, whether such disclaimers can actually dispel the deception might be a question of fact that cannot be resolved on a motion to dismiss or for sum-mary judgment. See *Dumont v. Reily Foods Co.*, 934 F.3d 35, 40 (1st Cir. 2019) (reversing dismissal on pleadings: "As with any question of fact, our role is limited to defining the outer boundaries of its answer—i.e., the point at which a juror could reasonably find only one way.").

Plaintiff also alleges plausibly that Walmart affirmatively intends to deceive its customers. Several allegations help ren-der this inference plausible, including Walmart's size, the hundreds of millions of dollars in profits allegedly available from the pricing discrepancies, and the company's heavy fo-cus on sales from brick-and-mortar stores. Given the im-portance of in-store sales for Walmart, as noted above, it is reasonable to infer that Walmart has available the latest re-search on how best to design and manage a retail store to maximize profits and is aware of the obstacles that would de-ter real consumers from trying to hold it to its advertised shelf prices. Kahn also alleges plausibly that Walmart, having been fined repeatedly for these price discrepancies, is aware of

them but chooses not to take more effective preventive measures to avoid more fines that plaintiff calls a drop in the bucket for Walmart.

We recognize that Walmart sells and must therefore maintain current prices for hundreds of thousands of products. Big, complicated human systems are prone to some errors. We agree with Walmart and its amici, the Retail Litigation Center, Inc. and others, that in designing and operating any real-world system, perfection is impossible. Error *rates*, on the other hand, can be managed. See *Fueger v. Case Corp.*, 886 N.E.2d 102, 106 n.1 (Ind. App. 2008). We assume that neither courts nor regulators can insist on perfection in retail pricing. They can, however, address how a retailer tries to prevent and remedy discrepancies like those alleged here. Even if some low level of price discrepancies is unavoidable, Walmart is not alleged to have undertaken any preventive or remedial measures to mitigate overcharges, such as by implementing systemic controls. Taking all of Kahn's allegations as true, and drawing all reasonable inferences in his favor, as we must at this stage, he has plausibly alleged that Walmart intended to deceive its customers with its inaccurate shelf prices.

4. *Distinguishing Tudor*

When deciding an issue of state law in a diversity action, "our task is to predict how the Illinois Supreme Court would decide the issues presented here." *Nationwide Agribusiness Ins. Co. v. Dugan*, 810 F.3d 446, 450 (7th Cir. 2015). "Where the Illinois Supreme Court has not ruled on the issue, decisions of the Illinois Appellate Courts control, unless there are persuasive indications that the Illinois Supreme Court would decide the issue differently." *Id.*

Walmart and the district court have relied on *Tudor v. Jewel Food Stores, Inc.*, 288 Ill. App. 3d 207, 681 N.E.2d 6 (1997). The case calls for close attention. In *Tudor*, a consumer plaintiff alleged that a defendant grocery store violated the ICFA because the prices scanned at the cash register differed from the advertised or shelf prices. The Illinois appellate court affirmed the trial court's grant of the grocer's motion to dismiss. The appellate court found that the plaintiff had failed to plead a viable ICFA claim because she had not adequately pled the same two elements the district court found lacking here: an unfair or deceptive act or practice, and the defendant's intent that plaintiff rely on the misrepresentation. The *Tudor* plaintiff had alleged that the store's internal audits showed the scanned prices were accurate 96% of the time. Significantly, the *Tudor* complaint itself acknowledged that the store had a "policy providing '[i]f the scanned price on any unmarked item is different from the price on the shelf, you will get the item free.'" *Id.* at 210. The store also provided a receipt enabling a customer to audit the accuracy of the charge for each item. The court found that the "combination" of these three factors, "the high accuracy rate …, along with the issuance of a receipt and defendant's policy of providing a money-back guarantee …, indicates there was no deception by defendant." *Id.* Nor was defendant's conduct "unfair," since the provision of a receipt and the money-back guarantee meant that "oppressiveness and lack of meaningful choice necessary to establish unfairness" were lacking. *Id.* These same two factors also indicated that the "defendant did not intend that plaintiff rely on an incorrectly scanned price." *Id.*

The district court here took the reasoning of *Tudor* two steps farther, finding that Walmart, by providing an accurate receipt alone, dispelled any possibility of deception. In this

case, plaintiff Kahn and the State of Illinois as amicus curiae argue that *Tudor* is distinguishable and that plaintiff Kahn has alleged sufficiently that Walmart's inaccurate shelf pricing is an unfair and deceptive practice within the meaning of the ICFA. We agree, and we predict that the Illinois Supreme Court, if faced with the allegations in this case, would also agree.

*Tudor* held that the plaintiff had failed to allege deceptive conduct based on the totality of the circumstances. 288 Ill. App. 3d at 211 ("[T]he case turns on whether the 96% accuracy rate of the scanners, in conjunction with the receipt and the money-back guarantee, shows a violation" of the ICFA.). We have twice recognized that *Tudor* relied on that totality of information available to consumers rather than on any single factor. See *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 884 (7th Cir. 2005); *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938–39 (7th Cir. 2001). Since a high accuracy rate and a money-back policy are not alleged here, *Tudor* does not support dismissal here.[9]

D. *Dismissal of Kahn's Remaining Claims with Prejudice*

The district court dismissed Kahn's remaining claims for the same reasons it dismissed his ICFA claim. For the same

---

[9] The money-back policy in *Tudor* went beyond a mere refund of the price difference. Jewel's policy was to give the consumer the item for free as a bounty for catching the price discrepancy. *Tudor*, 288 Ill. App. 3d at 210. That policy went well beyond merely honoring the shelf price and offered stronger evidence of a retailer's lack of intent for the consumer to rely on inaccurate prices than a policy that merely refunds the price difference. Offering consumers the full value of the item as a bounty gives them an incentive to look for price discrepancies and shifts the balance of incentives for the retailer closer to optimal deterrence.

reasons that we reversed the district court's holdings with respect to Kahn's ICFA claim, we also disagree with the district court's conclusions that he failed to allege plausible claims under the UDTPA.

The UDTPA, however, unlike the ICFA, does not authorize actual damages. 815 ILCS 510/3. Plaintiff seeks only injunctive relief (plus attorney fees) under the UDTPA. To support injunctive relief, Kahn needed to allege (and would ultimately need to prove) a likelihood of future injury. *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 740 (7th Cir. 2014); see also *Le v. Kohls Department Stores, Inc.*, 160 F. Supp. 3d 1096, 1108 (E.D. Wis. 2016) (analyzing plaintiff's Article III standing to bring claim for prospective injunctive relief under state consumer protection statute).

Kahn has not adequately pled a likelihood of future injury to him sufficient to support Article III standing for his UDTPA claim. He alleges that Walmart is persisting in its deceptive and unfair practices. He does not allege, however, that he intends to continue shopping at Walmart in the future or that he would be unable to avoid future injury after having discovered Walmart's alleged practices. It may be possible for plaintiff to plead a likelihood of future harm, particularly in light of the injuries to consumers routinely caused by bait-and-switch pricing schemes explained above, such as the time and mental energy reasonable consumers must expend to protect themselves from the alleged unfair and deceptive practices. Plaintiff has not done so in his operative complaint, but because leave to amend would not necessarily be futile on the issue of future injury, we also reverse the district court's decision to deny Kahn leave to amend.

The district court dismissed plaintiff's unjust enrichment claim, reasoning that he failed to allege deception plausibly and the claim could not stand on its own, without a viable statutory claim. Because plaintiff adequately pled the elements of a deceptive and unfair practice and intent to deceive under both the ICFA and the UDTPA, we also reinstate Kahn's unjust enrichment claim. At this preliminary stage of the case, we see little daylight between the remedies available under his statutory consumer protection claims and his unjust enrichment claim. But at least for now, Kahn may plead and pursue his unjust enrichment claim in the alternative, such that if he cannot prove some of his statutory claims later in litigation, he might still be able to prevail on his claim for unjust enrichment. See Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency."). Accordingly, we reverse dismissal of plaintiff's unjust enrichment claim.

Finally, the district court concluded that because it had dismissed all of Kahn's individual claims, he could not pursue claims on behalf of a class. The district court dismissed his class claims without prejudice. Because the district court erred in dismissing Kahn's individual ICFA, UDTPA, and unjust enrichment claims with prejudice, we also reverse the dismissal of his class claims.

The judgment of the district court is REVERSED, and this case is REMANDED for further proceedings consistent with this opinion.